This opinion contains the court's findings and conclusions.

The **WESTERN PACIFIC RAILROAD COMPANY et al.,** Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

Civ. No. 41779.

United States District Court
N. D. California.

Nov. 22, 1966.

E. L. Van Dellen, Walter G. Treanor, San Francisco, Cal., E. Barrett Prettyman, Jr., Hogan & Hartson, Washington D. C., for plaintiffs The Western Pacific Railroad Co., Sacramento Northern Railway, Tidewater Southern Railway Co.

Charles W. Burkett, W. Harney Wilson, Gary S. Anderson, San Francisco, Ca., for intervening defendant Southern Pacific Co.

F. J. Melia, J. H. Anderson, William P. Higgins, Omaha, Neb., and Robert N. Lowry, Brobeck, Phleger & Harrison, San Francisco, Cal., for intervening defendant Union Pacific Railroad Co.

Vaughan, Paul & Lyons, Varnum Paul, San Francisco, Cal., Earl F. Requa, Frank S. Farrell, Saint Paul, Minn., for intervenor-defendants Northern Pacific Railway Co., and others.

Donald F. Turner, Asst. Atty. Gen., Joseph J. Saunders, John H. Dougherty, Attys. Dept. of Justice, Washington, D. C., for defendant.

Robert W. Ginnane, Gen. Counsel, Robert S. Burk, Atty., Interstate Commerce Commission, Washington, D. C., for intervening defendant Interstate Commerce Commission.

ORDER SETTING ASIDE REPORT AND ORDER OF THE INTERSTATE COMMERCE COMMISSION

Before MERRILL, Circuit Judge, SWEIGERT and ZIRPOLI, District Judges.

SWEIGERT, District Judge.

This case, which is before this Court on remand from the decision of the United States Supreme Court in Western Pacific R. R. Co. v. United States, 382 U.S. 237, 86 S.Ct. 338, 15 L.Ed.2d 294 (1965), is an action brought under the provisions of 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325 (1964) to enjoin, annul and set aside a report and order of the Interstate Commerce Commission (Commission).

The question presented herein is whether the Commission erred in holding that defendants Northern Pacific Railway Co., Union Pacific Railroad Co. and certain of their short-line connections[1] did not violate Section 3(4) of the Interstate Commerce Act, 24 Stat. 380 (1887), as amended, 49 U.S.C. § 3(4) (1964) by refusing to establish through routes and joint rates with plaintiffs[2] between points in the Pacific Northwest served by defendants and points in California served by plaintiff via Portland, Oregon, on the same basis as those maintained by defendants with the Southern Pacific Company through Portland, Ore-

[1]. The allegedly discriminating defendants are Northern Pacific Railway Company, Camas Prairie Railroad Company and Walla Walla Valley Railway Company (Northern Pacific) and Union Pacific Railroad Company (Union Pacific), hereinafter referred to as defendants. Other named defendants in the complaint filed in the Commission action were: The Atchison, Topeka & Santa Fe Railway Company; The Great Northern Railway Company; The Pacific Coast R.R. Co.; The Spokane International Railroad Company, a subsidiary of Union Pacific; and the Washington, Idaho and Montana Railway Company. The Northern Pacific and Union Pacific and their subsidiaries denied the allegations of the complaint. The Great Northern, Pacific Coast, Santa Fe

and Washington, Idaho and Montana answered the complaint with expressions of willingness to establish and maintain the routes and rates sought. The Southern Pacific Company intervened in opposition to the complaint. The United States of America which had maintained a neutral position before the Commission and at the first hearing in this Court now joins with plaintiff and did so before the Supreme Court of the United States.

[2]. Plaintiffs are The Western Pacific Railroad Company and its short line subsidiaries (The Sacramento-Northern Railway and Tidewater Southern Railway Company) and will hereinafter be referred to as "Western Pacific" or "plaintiff".

gon. Western Pac. R. R. Co. v. Camas Prairie R. R. Co., 316 I.C.C. 795 (1962).

Section 3(4) provides in substance that all carriers shall afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines and connection lines and shall not discriminate in their rates, fares and charges between connecting lines or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper.

In its earlier opinion, this Court affirmed the Commission's decision on the ground that the plaintiff was not a connecting line of the Northern Pacific and the Union Pacific at Portland, Oregon, within the meaning of Section 3(4) and therefore did not have standing to complain of alleged discrimination under Section 3(4). Western Pac. R. R. Co. v. United States, 230 F.Supp. 852 (N.D.Cal. 1964).[3] Having found that plaintiff was not eligible to complain of alleged discrimination, this Court did not reach the question of whether the Commission was correct in concluding that, even if plaintiff had standing to complain, defendants had not violated Section 3(4).

On direct appeal, the Supreme Court held that plaintiff was a "connecting line" and therefore eligible to attack the alleged discrimination. In the course of its decision the Supreme Court, after pointing out that such a construction of "connecting line" does not interfere with the function of the Interstate Commerce Commission under § 15(3) of the Inter-

state Commerce Act, 54 Stat. 911, 49 U.S.C. § 15(3) (1964) to require joint through routes and rates in the public interest, said at 382 U.S. 245–246, 86 S. Ct. at 344:

"Section 3(4) is applicable only to a narrower range of situations involving discrimination at a common interchange. Moreover, the remedy in § 3(4) situations need not entail the establishment of through routes, joint rates, or indeed any particular form of relief. *All that is required is the elimination of discriminatory treatment.* See Chicago, Indianapolis & Louisville R. Co. v. United States, 270 U.S. 287, 292–293 [46 S.Ct. 226, 70 L.Ed. 590]; United States v. Illinois Central R. Co., 263 U.S. 515, 520–521 [44 S.Ct. 189, 68 L.Ed. 417]. Finally, our holding does no more than to define the characteristics of a carrier eligible to complain. Relief is warranted only if it also appears that differential treatment is not justified by differences in operating conditions that substantially affect the allegedly discriminating carrier. See United States v. Illinois Central R. Co., supra [263 U.S.] at p. 521 [44 S.Ct. at p. 192]; Atchison, Topeka & Santa Fe R. Co. v. United States, D.C., 218 F.Supp. 359, 360." (emphasis added).

The Supreme Court has plainly established as the law of this case that differential treatment of plaintiff Western Pacific by defendants Northern Pacific and Union Pacific can be justified only

---

3. The factual background of this case, as set forth in the above opinion at 230 F. Supp. 854, is as follows: The two routes considered herein are called the Bieber route and the Southern Pacific route. The former was created by an order of the Commission in 1931 and was designed to be a competitor with the Southern Pacific route. See Great Northern Ry. Co. Construction, 166 I.C.C. 3, 170 I.C.C. 399. For purposes of this case, the Bieber route consists of the Santa Fe from points in southern California to Stockton, California, thence Western Pacific to Bieber, California, and thence Great Northern to Portland, Oregon. This line extends along the eastern side of north-

ern California through eastern Oregon to Wishram on the Columbia; from Wishram the line runs to Vancouver, Washington and thence to Portland, Oregon. The Southern Pacific route extends from points in southern California by either Santa Fe or Southern Pacific, through the central part of northern California and central Oregon to Portland. Southern Pacific and defendants have maintained a system of through routes and rates at the Portland interchange for over 50 years. With the exception of a few commodities, defendants have refused to establish a similar system of through routes and rates with Western Pacific.

by differences in operating conditions *"that substantially affect the allegedly discriminating carrier[s]"*, Northern Pacific and Union Pacific. (emphasis added).

That the statement of this test by the Supreme Court was made purposely and not merely as meaningless surplusage is indicated by the statute, itself, 49 U.S.C. § 3(4). This statute establishes the basic rule that carriers "shall not discriminate in their rates, fares and charges between connecting lines."

■ Such discrimination exists when a carrier (in this case Northern Pacific or Union Pacific) enters into a joint through rate arrangement with another connecting line carrier (in this case Southern Pacific), but refuses to enter into the same rate arrangement with another connecting line (in this case Western Pacific).

■ Certainly it would border on the absurd to hold that dissimilar operating conditions on the two competing routes (in this case the Bieber route and Southern Pacific route) could justify what would be otherwise a breach of the statutory prohibition when such dissimilar conditions, while possibly affecting Southern Pacific and the Bieber route carriers, do not affect the allegedly discriminating carriers.

■ There must be something in the dissimilarity of operating conditions which would make it unfair, or unjust to require an allegedly discriminating carrier to extend to a connecting carrier the same joint through rate arrangement which it maintains with another connecting carrier. Otherwise, there would be nothing to justify the discrimination.

■ Although the two cases cited by the Supreme Court involved Section 3(1) of the Interstate Commerce Act, not Section 3(4), they do establish the principle that preferences to shippers or localities mentioned in Section 3(1) are proper only when a lack of similarity of conditions "justifies" the preferences. See Atchison, Topeka & Santa Fe R. Co. v. United States, supra, 218 F.Supp. at 369.

■ Dissimilar operating conditions do not always and necessarily affect the allegedly discriminating carrier in such manner that it should be allowed to claim such dissimilarities as justification for the discrimination. Therefore, dissimilar operating conditions between the two routes involved here (Southern Pacific route and the Bieber route) do not, per se, justify the alleged discrimination.

As the opinion of the Supreme Court notes, this is not a case in which the Commission is called upon to decide under Section 15(3) whether in the public interest a carrier, such as Northern Pacific or Union Pacific, should be required to establish, or for that matter to eliminate, through routes and rate arrangements with either the Western Pacific or Southern Pacific.

In this case, Northern Pacific and Union Pacific have voluntarily entered into a joint through route arrangement with Southern Pacific and could terminate such arrangement at any time the parties see fit.

Western Pacific is simply contending that, so long as this voluntary joint through rate arrangement is maintained by Northern Pacific and Union Pacific with Southern Pacific, then Northern Pacific and Union Pacific must not, in violation of Section 3(4), discriminatorily refuse to extend the arrangement to Western Pacific.

The Commission has rejected this contention solely upon the ground that "the evidence of record does not establish the similarity of circumstances and conditions which justifies equality of treatment."

■ The very form of this finding suggests that the decision of the Commission in this case was based upon a test quite different from, and far more lenient in favor of defendants, than the test stated by the Supreme Court, which is, not whether similarity of circumstances and conditions justify equality of treatment, but whether dissimilarity of conditions and circumstances justify the discrimination.

The burden of proof is not upon Western Pacific to show similarity of circumstances to justify their claim for equality of treatment, but only to show that a discrimination is practiced by defendants as between Western Pacific and the other Bieber route carriers, on the one hand, and the Southern Pacific, on the other, in respect to the existing joint through rate arrangement. The burden of proceeding would then shift to defendants to prove some dissimilarity of operating conditions that would substantially affect them in the event they were required to grant equality of treatment. See Seatrain Lines, Inc. v. United States, 233 F.Supp. 199, 210 (D.N.J.1964); Atchison, Topeka & Santa Fe R. Co. v. United States, supra at 374.

The complaint alleges that the defendants, Northern Pacific and Union Pacific, have established with Southern Pacific joint through routes and rates for the routing of traffic via the Southern Pacific route (extending from Portland, Oregon to Southern California) from points served by defendants in the northwest to points served in California by Southern Pacific; that plaintiff, Western Pacific, has requested defendants to establish joint through rates and routes via the Bieber route (a separate route extending from Portland, Oregon to Southern California) from points in the northwest served by defendants to points in California served by the Bieber route carriers (Great Northern, Western Pacific and Santa Fe); that these Bieber route carriers are willing to voluntarily establish such just, reasonable, equitable, non-preferential and non-prejudicial divisions as will assure the defendants and their short line connections the same earnings under the sought routes and rates as the latter carriers are now earning on the involved traffic which they now interchange with the Southern Pacific at Portland, Oregon; and that defendants have refused to do so.

The Commission made findings and conclusions (Report of Commission. Discussion and Conclusions, P.T. 640–45) [4] which are almost entirely devoted to the issues of whether Western Pacific is a connecting line within the meaning of Section 3(4) and whether under Section 15(4) the Commission should prescribe joint through routes and rates. The conclusion on the issue of discrimination in violation of Section 3(4) is that the failure and refusal of the defendants to establish joint through routes and rates with plaintiff via the Bieber route, between points in California, on the one hand, and points in Oregon, Washington and Idaho, on the other, through Portland, Oregon, on the same basis as those published in connection with the Southern Pacific, is not shown to be unjust or unreasonable, nor to result in discrimination against the complainants in violation of Section 3(4) of the Act. (Report of the Commission, P.T. 645).

The only findings related to this conclusion are the finding that, "Even if the complainants were connecting carriers, the evidence of record does not establish the similarity of circumstances and conditions which justifies equality of treatment" (P.T. 643) and the finding that "The routes sought through Bieber and Portland are longer and involve more difficult operating conditions than the Southern Pacific route, and they require hauls in a general direction opposite to the direct movement." (P.T. 641).

There is no Commission finding that any of the dissimilar operating conditions are such as to affect either Northern Pacific or Union Pacific, the allegedly discriminating carriers, or that the dissimilar operating conditions affect Northern Pacific or Union Pacific in a substantial manner.

The Commission, aware of its failure to make any such finding, now argues in its brief that "it should be obvious" that the dissimilarities found by the Commission would have a substantial adverse

4. Citations to the record are the printed two volume Transcript of Record

before the Supreme Court which had been filed with this Court for use on remand.

effect on the discriminating carriers if they were required to participate in equal rates with plaintiff.

The test stated by the Supreme Court in this case is "Relief is warranted only if it also appears that differential treatment is not justified by differences in operating conditions that substantially affect the allegedly discriminating carrier."

There has been a great deal of discussion in the briefs about whether the test laid down by the Supreme Court permits this Court to consider conditions south of Portland. This, however, is not the real point involved in this case.

We proceed upon the assumption that operating conditions along the entire route here involved may properly be considered by the Commission and by this Court.

The real question is whether any differences in operating conditions, regardless of whether they exist south of Portland or north of Portland, are such as to substantially affect Northern Pacific and Union Pacific or either of them.

A reading of the Commission's Report and the briefs of the Commission indicates that the Commission did not consider the effect of the operational dissimilarities on the defendant carriers nor did it consider whether such effect, if any, was substantial enough to justify the existing rate discrimination.

In 1964 when this case was first before this Court, the Commission in its brief argues that it was "plaintiff's burden to establish the requisite similarity of circumstances and conditions" [Brief for Interstate Commerce Commission, p. 31] in order to be entitled to equality of treatment. This certainly is not the test laid down by the Supreme Court.

In its present brief, the Commission again argues that the plaintiffs have the burden of showing "the requisite similarity of circumstances and conditions justifying equality of treatment" [Brief for Interstate Commerce Commission, pp. 11, 28].

The brief states that the test applied by the Commission is in no way contrary to the test stated by the Supreme Court in this case [p. 23]. The Commission, however, acknowledges that there are no findings upon the issue whether any differences in operating conditions affect either Northern Pacific or Union Pacific, or upon the further issue whether the effects, if any, of difference in operating conditions upon Northern Pacific and Union Pacific are substantial.

The Commission asks this Court to review certain subsidiary findings of the Commission concerning certain dissimilarities in operating conditions [p. 28] and then find from such subsidiary findings that they "obviously" have "a substantial adverse effect on the discriminating carriers."

Implicit in this argument is the concession that the Commission did not clearly apply the test laid down by the Supreme Court. Otherwise, the Commission Report would contain findings concerning the effect of the dissimilarities over the two routes on the defendant carriers and concerning the substantiality of any such effect.

Without in any way intending to substitute our judgment for that of the Commission, we have examined the subsidiary findings. It is not "obvious" to this Court that the differences in operating conditions found by the Commission substantially affect the alleged discriminating carriers—Northern Pacific and Union Pacific. Considered as a whole these findings seem to make it at least arguable that the differences do not substantially affect the discriminating carriers.

*Operating Routes South of Portland*

For example, the Commission found that "[I]n most instances, the Bieber route between points in California considered herein and Portland is longer, has more interchanges, goes through more engine districts, and has higher rises and more curvature than the Southern Pacific route."

148

The Commission also found that "[T]he Southern Pacific using western-district costs and Rail Form A, developed out-of-pocket costs over the Bieber route which exceed those over the Southern Pacific route to Portland by 25 per cent from Los Angeles and 15 per cent from San Francisco. According to the Southern Pacific, these cost data do not take into consideration differences in such matters as total degrees of curvatures, feet of rise, and total rise, which it is claimed would result in greater differences in favor of its route."

The Commission in its brief at 638–39 argues: "Another obvious adverse effect is the substantially higher cost of service over the route for which plaintiffs seek equal rates. In addition to the previously discussed importance of this factor, this higher cost would mean a lower profit for the carriers to divide over that route than over the present route."

Just how the higher cost of service involved in the Bieber route south of Portland could mean a lower profit for the defendants Northern Pacific and Union Pacific, or in any way adversely affect Northern Pacific or Union Pacific, is not clear.

The plaintiffs state in their complaint and in their briefs that the Bieber route carriers seek only the same joint through rates with defendants as presently exist between defendants and Southern Pacific and divisions of said joint through rates "as will assure the Northern Pacific, Union Pacific and short line connections the same earnings under the sought routes and rates as the latter carriers are now earning on the involved traffic which they now interchange with the Southern Pacific Company at Portland, Oregon * * *."

Under this arrangement it would seem that the higher cost of service for Santa Fe, Western Pacific or Great Northern, as Bieber route carriers, could not mean a lower profit for the defendants, Northern Pacific and Union Pacific, since the latter would receive the same earnings as it does with the joint through rates with Southern Pacific.

The cost of service by Northern Pacific and Union Pacific along their own lines would be the same as if these carriers were operating under the joint through rates and routes with Southern Pacific.

In its testimony at the hearings, Western Pacific recognizes [P.T. 36] that its own revenue per car would be less under joint through rates with defendants, Northern Pacific and Union Pacific, than its revenue per car in the year 1959. However, this effect, upon Western Pacific and other Bieber route carriers, if the discrimination were ordered to cease, would have to be absorbed by the Bieber route carriers, not by Northern Pacific or Union Pacific.

*The Portland Transfer*

■ The Commission noted that trains arriving by Great Northern from the Bieber route first come to Vancouver, Washington, located on the northern side of the Columbia River across from Portland, Oregon. If cars are to continue via Great Northern to Seattle and other points north of Vancouver, they do not cross the Columbia River into Portland. They simply go directly north to their destination. If, however, cars from the Bieber route are to interchange from Great Northern with either the Northern Pacific or Union Pacific at Portland, Oregon, the cars are transferred southerly from the Great Northern terminal at Vancouver, Washington, across the Columbia River and Willamette River bridges to the Northern Pacific Terminal Company yard, a distance of 8 miles. At this yard, Great Northern and Northern Pacific interchange cars.

Mr. Hardin, Terminal Superintendent for Union Pacific at Portland, testified that "all traffic interchanged at Portland between the Union Pacific Railroad Co. and connecting lines, except the Southern Pacific, is interchanged at the Northern Pacific Terminal Company Depot yard." [P.T. 225]. Mr. Hardin

further testified that Union Pacific engines and crews move the cars from the Northern Pacific Terminal Company Depot yard to Union Pacific's Albina yard, which is located across the Willamette River from the Northern Pacific Terminal Company yard.

The Commission found, based upon the testimony of Mr. Hardin, that the time for a Great Northern car to go from Vancouver, Washington, to the Northern Pacific Terminal Company yard and then be further transferred to the Union Pacific yard is 13 hours and 20 minutes.

Mr. Hardin testified and the Commission so found that a transfer of a car between the Union Pacific's Albina yard and the Northern Pacific Terminal Company yard costs the Union Pacific $3.69 per car.

Mr. Hardin testified that a transfer of a car between Southern Pacific and Union Pacific takes place between Southern Pacific's Brooklyn yard and Union Pacific's Albina yard and that both yards are located on the same side of the Willamette River approximately 4½ miles apart. The Commission found, based on Mr. Hardin's testimony, that a car transfer between Southern Pacific and Union Pacific takes an average of 3 hours and 20 minutes and costs the Union Pacific an average of .4688 cents per car.

With the exception of a statement in the Report of the Commission that "there is no indication that [an interchange between Northern Pacific and Great Northern] would differ from that between the Northern Pacific and Southern Pacific" (there are no details on a transfer between Northern Pacific and Southern Pacific or between Northern Pacific and Great Northern in the testimony at the hearings), the foregoing is substantially all that there is in the record concerning the interchange of cars at Portland, Oregon. The only detailed testimony at the hearings regarding the Portland transfer is that of Mr. Hardin.

The defendants and the Commission place great emphasis upon the fact that it costs the Union Pacific only .4688 cents to make a car transfer between the Union Pacific and Southern Pacific while it costs the Union Pacific $3.69 to make a car transfer between itself and Great Northern.

However, examination of the testimony of Hardin and his Exhibit No. 27 showing the interchange facilities at Portland, Oregon, reveal that in all likelihood the most expensive interchange of all is that between the Northern Pacific Terminal Company yard and the Southern Pacific's yard. The Southern Pacific's yard is located across the Willamette River from the Northern Pacific Terminal Company yard, which yard serves as the Portland terminal for both Northern Pacific and Great Northern.

In spite of this expensive interchange between the Southern Pacific yard and the Northern Pacific Terminal Company yard, Northern Pacific and Southern Pacific maintain the same joint through rates as Union Pacific and Southern Pacific between points in the Northwest served in common by Northern Pacific and Union Pacific and points served in California by Southern Pacific.

If Southern Pacific and Northern Pacific can make an interchange, which apparently involves distances as long as and costs as high as would be involved between Union Pacific and Great Northern, and still maintain the same joint through rates as between Union Pacific and Southern Pacific, why cannot Union Pacific, as well as Northern Pacific, extend the same joint through rates with Great Northern to serve the Bieber route?

The record does not show nor did the Commission find upon the custom and practice or agreement under which Southern Pacific and Northern Pacific apportion costs involved in interchange of cars.

The joint through rate agreements deal only with freight classifications, routes, rates and a division of the rates

between the connecting carriers. Apparently, arrangements for apportionment of interchange costs are covered by separate or supplemental agreements or custom or practice.

In any event, assuming higher interchange costs in an interchange between Union Pacific and Great Northern then in an interchange between Union Pacific and Southern Pacific, the Bieber route carriers offer the defendants, Union Pacific and Northern Pacific, a division of the requested joint through rate that will preserve the same earnings to defendants which they now enjoy under their joint through rate arrangements with Southern Pacific.

We assume that any difference in interchange costs would be taken into consideration to achieve this result by the Bieber route carriers. Accordingly, it is difficult for this Court to understand how such joint through rate arrangements could adversely affect the alleged discriminating carriers, Northern Pacific and Union Pacific by reason of Portland interchange costs.

The Commission made no finding on the effect of the Portland transfer upon defendants, Northern Pacific and Union Pacific, and as previously examined, the subsidiary findings do not make it obvious to this Court that defendants would be affected in any adverse manner. It appears to the Court that so far as interchange at Portland is concerned, and apparently so far as any other dissimilarities are concerned, the Commission was concerned only with claimed dissimilarities as such without regard to whether such dissimilarities would or would not substantially affect the defendants, Union Pacific and Northern Pacific, if the same joint through rate arrangements were extended to Great Northern as presently exist with Southern Pacific.

*Operating Routes North of Portland*

The record shows that Northern Pacific has two routes it can use for the carriage of freight from Portland, Oregon, to points east of the Cascade Moun-

tains. One route extends north from Portland, Oregon, to Auburn, Washington, (near Seattle) and thence southeast to Yakima and Pasco. The other route requires Northern Pacific to use the lines of the Spokane, Portland & Seattle Railway System (SP&S), which is equally owned and controlled by the Northern Pacific and Great Northern, from Vancouver, Washington, along the north side of the Columbia River to Pasco, Washington. According to Exhibit No. 32, the distance from Portland, Oregon to Pasco, Washington, via Auburn is 387 miles while the distance from Portland, Oregon to Pasco, Washington, via SP&S, is only 231 miles.

Mr. L. S. Davis, General Freight Agent for Northern Pacific, testified that it was the policy of Northern Pacific to establish joint rates with SP&S between Portland and points on the Northern Pacific east of the Cascade Mountains and that "[T]his rate coverage is also extended to the connecting line of the Southern Pacific at Portland." [P.T. 268]. Thus, freight going from Los Angeles to Walla Walla, Washington, under the joint through rates established by Southern Pacific and Northern Pacific will move from Los Angeles to Portland via the Southern Pacific route, from Portland, Oregon to Pasco, Washington, via SP&S and from Pasco, Washington to Walla Walla, Washington via Northern Pacific.

However, without giving any reasons therefor, Mr. Davis testified and the Commission so found that cars delivered to Northern Pacific at Portland, Oregon, from the Bieber route, which are destined for points east of the Cascade Mountains, would have to use the longer route of Northern Pacific via Auburn. The Commission stated "Under the routes sought, the Northern Pacific would be unable to use the shorter SP&S route between Portland and Pasco. Instead, it would use its more circuitous route through Auburn for movement east of the Cascade Mountains."

The record is totally lacking in justification for the finding that the

Northern Pacific would be unable to use the shorter SP&S route when receiving freight from the Bieber route under the proposed joint through rates between Northern Pacific and the Bieber route carriers. Surely if the reason is the present lack of an agreement between Northern Pacific and SP&S covering the connecting line of the Great Northern at Portland, this can be remedied. SP&S is equally owned and controlled by Northern Pacific and Great Northern and there is nothing in the record to indicate that SP&S would not enter the same sort of agreement respecting the connecting line of the Great Northern at Portland, Oregon, as it has respecting the connecting line of the Southern Pacific.

 The Commission also found that a transfer of a car from the Bieber route to Northern Pacific at Portland, Oregon, requires the car to go from Vancouver, Washington across the Columbia River and Willamette River bridges to the Northern Pacific Terminal Company yard at Portland, where it is transferred to Northern Pacific. Then Northern Pacific returns the car across the Columbia River and Willamette River bridges to Vancouver, Washington, and thence moves it to its destination in the Northwest. The Commission found that this "represents costly and wasteful transportation to and from Portland, as substantial bridge mileage is involved."

Again, this Court cannot understand how the above affects Northern Pacific. Great Northern brings its cars to the Northern Pacific Terminal Company yard in Portland and Northern Pacific performs the same identical service in returning the car to Vancouver and thence to its destination as it does for a car received from Southern Pacific. Again, this indicates that the Commission was solely concerned with claimed dissimilarities as such and not their effect on the defendants, Northern Pacific and Union Pacific.

*Transit Time*

 The Commission found, "From Los Angeles to Seattle, the shortest time over the Southern Pacific route in connection with the Union Pacific is 44 hours, which is 26 hours less than over the route sought [Bieber-Union Pacific]. From Spokane to Los Angeles using the Union Pacific, the shortest time over the Southern Pacific route would be 55.5 hours, whereas it would require 81 hours over the Bieber route."

However, the record shows, according to the testimony of C. W. Evers, Traffic Manager for Union Pacific, that "the schedules of the Southern Pacific and Union Pacific are coordinated in order to provide the least possible dead time at Portland, whereas via the Portland Gateway, in connection with the Bieber route, there would be considerable dead time." [P.T. 258].

Apparently, the Commission in making the above findings did not take into consideration the possibility of Great Northern and Union Pacific coordinating their schedules if the proposed rates and routes are established.

*Loss of Use of Cars*

 With respect to the longer transit time involved in moving along the proposed routes, the brief of the Commission argues as follows on the question of its adverse effect:

"For instance, in these days when even the general public in the area here involved is acutely aware of freight car shortages, the substantial adverse effect on the discriminating carriers' supply is apparent. By way of illustration, as the Commission noted, a Union Pacific car going from Los Angeles to Seattle over the present Southern Pacific-Union Pacific route is in transit 44 hours, whereas, if the car moved Bieber route-Union Pacific, it would take 26 hours longer. This means that the Union Pacific can have that car participate in a little more than three revenue movements over the present route for every two such

movements, at the same rate, over the Bieber-Union Pacific route, if plaintiffs were to here prevail."

However, the adverse effect of this situation upon the alleged discriminating carriers is not so apparent or obvious. Mr. L. S. Davis, General Freight Agent of the Northern Pacific, testified that a shipper usually routes his freight and "ordinarily he doesn't want circuitous routes. In most cases today people require expeditious service. They work on low inventories, and they want their cars in yesterday." [P.T. 300].

Thus, it appears from this testimony that the chances of freight being routed by the more circuitous and time consuming Bieber route-Union Pacific from Los Angeles to Seattle, even under competitive rates, is remote. However, in those instances where Southern Pacific could not immediately supply its shippers with cars (which, according to the testimony of some shippers, does occur), but cars were available from a Bieber route carrier, the shipper could ship his goods to Seattle more expeditiously and at competitive rates.

This would suggest that the adverse effect in this respect, if it exists, would not be substantial.

### Short-hauling

█ In its Report, the Commission made the following findings on the question of "short-hauling" the defendants:

"The defendants contend that the establishment of the routes sought would short-haul them in violation of Section 15(4) of the act. As shown herein, the SP&S is under the common control and management of the Northern Pacific and Great Northern. The routes which the complainants seek to establish would require the Northern Pacific to exchange traffic with the Great Northern at Portland despite the fact that the SP&S and Union Pacific also operates for 246 miles between Portland and Bend, and it connects with the Great Northern at the latter point. If the routes sought were established, it would be required to

interchange traffic with the Great Northern at Portland, which would short-haul it by 246 miles on every movement."

The question presented here is not whether defendants should be required to accord their existing joint through rates and routes to plaintiff, but whether defendants should be required to eliminate any discriminatory treatment of the Bieber route carriers. Accordingly, if defendants chose to end the present discrimination by terminating its joint through rates and routes with Southern Pacific, then there is no question of short-hauling.

However, even if defendants chose to end the discrimination by establishing joint through rates and routes with plaintiff, it does not appear to this Court that the denial of the short-haul from Portland to Bend will constitute a difference in operating conditions that will substantially affect the defendants.

The present record shows that in 1959 and 1960 only 30 carloads of traffic were shipped to or from points on the Northern Pacific and Union Pacific in Oregon, Washington and Northern Idaho via the Bieber route under the local combination of rates. [P.T. 34]. Of these 30 carloads, only one was interchanged at Bend, Oregon. See Tables 17 and 18 of Exhibit # 3 [P.T. 340–41].

Accordingly, while defendants will be denied the short-haul from Portland to Bend for all traffic generated by the establishment of joint routes and rates between defendants and plaintiff, it does not appear that this will substantially affect them since at the present time and under the present joint through routes and rates with Southern Pacific, defendants have virtually no traffic movements along their lines from Portland to Bend and thence via Bieber.

### The Rate Floor Argument

█ Finally, the Commission argues in its brief that "plaintiffs' test" would not only result in serious adverse effects on the defendant carriers, it would also severely cripple the Commission's reg-

ulatory powers to the great detriment of all carriers and the public. [Brief for the Interstate Commerce Commission, p. 24].

In the first place, our problem is not to apply "plaintiffs' test" but to apply the test framed for this case by the Supreme Court.

The foregoing contention of the Commission is based upon the argument that an overall rate must cover overall costs over the entire route; that rates must be compensatory; that, if defendant carriers are required to extend to the Bieber route carriers the same joint through rate arrangements which they extend to Southern Pacific, the higher costs over the route embracing the Bieber route carriers would become the floor under their ability to engage in rate competition with other carriers; that this would be a detriment to defendant carriers in their efforts to compete with motor carriers and with the present route of the Great Northern serving the same points as defendants.

Just how extension of the existing joint through rate to the Bieber route carriers could in some manner eventually establish Bieber route costs as a "floor" for joint through rates in some such manner as to eventually and adversely affect the defendant carriers is difficult to understand.

Even if Western Pacific and other Bieber route carriers, should discover that their operation under the joint rate would be "non-compensatory", they could not then demand that a higher joint through rate be agreed to by Northern Pacific or Union Pacific, since the only obligation of Northern Pacific and Union Pacific under Section 3(4), is to extend to Western Pacific equality of treatment. Nor would the Commission be bound to compel Northern Pacific or Union Pacific to establish a higher joint through rate.

Further, there is nothing in the record showing that Western Pacific's operations under the proposed joint through rate agreement would be non-compensa-tory. It is conceivable that the high cost factors of the longer Bieber route might well be offset by other operating factors e. g., greater efficiency of Western Pacific. This is not a rate case; it is a discrimination case.

This Court repeats and emphasizes its view that the issue here is, not whether defendants should be required to accord their existing joint rate arrangements to the Bieber connecting carrier or to terminate its existing joint rate arrangements. Rather, the issue, as plainly stated by the Supreme Court, is whether defendants should be required to eliminate whatever discriminatory treatment of the Bieber connecting carriers exists. Unlawful discrimination exists when and to the extent that the discriminating is not "justified" by dissimilar operating conditions which would substantially affect the discriminatory carriers if they were required to eliminate it. To what extent any existing discrimination is so justified and what, if any existing arrangements should either be terminated or accorded to the Bieber carriers is not a matter for this Court to determine. The Court has merely pointed out why it is not obvious from the record that the dissimiliarities found by the Commission are such as to substantially affect the discriminating carriers.

These are matters for the Commission to determine upon such findings and conclusions as will enable the Court to ascertain whether the Commission has properly considered and applied the test prescribed by the Supreme Court and, if so, whether its findings are supported by substantial evidence.

The record in this case suggests the need for closer compliance with the provisions of Administrative Procedure Act, 5 U.S.C. Sec. 1007(b) (1964) which applies to proceedings of the Interstate Commerce Commission and requires that all decisions "shall * * * include (1) findings and conclusions, as well as the reasons therefor, upon all the material issues of fact, law or discretion presented on the record." (See Atchi-

son, Topeka & Santa Fe R. Co. v. United States, supra, 218 F.Supp. 369).

The Order of the Interstate Commerce Commission is set aside and the case is remanded to the Commission for further proceedings consistent with this opinion.